**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TOM BRADY**, *individually, and on behalf of all other similarly situated persons,* ) ) ) | FILED: JULY 23, 2008 |
| Plaintiff, ) | 08CV4189 |
| v. ) ) | JUDGE LEFKOW |
| **AVENT AMERICA, INC.**, *on behalf of itself and on behalf of a Defendant Class of producers, manufacturers, and/or distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A,* ) ) ) ) ) ) ) | MAGISTRATE VALDEZ  NF |
| Defendants. ) | |

Plaintiff TOM BRADY ("Plaintiff"), individually and on behalf of all other persons similarly situated, files this Class Action Complaint (the "Complaint") and alleges upon personal knowledge matters pertaining to himself and his own acts, and as to all other matters, upon information and belief, based upon the investigation undertaken by his counsel:

**I.  SUMMARY OF THE ACTION**

1.      This is a nationwide class action lawsuit brought on behalf of Plaintiff and other similarly situated individuals (the "Plaintiffs" and the "Plaintiff Class") against Avent America, Inc. ("Defendant Avent"), individually, and as the representative of a Defendant class (the "Defendants" and the "Defendant Class") comprised of all entities which produce, manufacture, and/or otherwise distribute polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A ("BPA") that have been subsequently purchased by Plaintiffs. Specifically, Plaintiff brings this action on behalf of those who, over the past five years, purchased polycarbonate plastic bottle products containing BPA that were produced, manufactured, distributed, and/or sold by the Defendants and who were accordingly damaged thereby.

2.      BPA, a chemical which Defendants use to make their polycarbonate plastic bottle products, is a dangerous chemical that has been linked to serious human health problems. Numerous studies and papers over the past several years, including very recent reports, have repeatedly shown that BPA can be toxic to humans even at extremely low doses. Recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

3.      Yet, as alleged more fully below, despite this well-documented scientific evidence, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using this dangerous chemical which has been known for years to be toxic in several respects and which poses serious hazards to individuals' health.

4.      Defendants have breached (and continue to breach) their duty to adequately disclose relevant and appropriate information regarding BPA in the marketing and sale of their polycarbonate plastic bottle products.

## II.  PARTIES

5.      Plaintiff is a resident of the state of Illinois. Plaintiff purchased polycarbonate plastic bottle products containing BPA and bearing the mark of Defendant Avent.

6.      Defendant Avent America, Inc. is an Illinois Corporation with its principal offices located in Bensenville, Illinois. Defendant Avent produces, manufactures, distributes, and/or sells an array of polycarbonate plastic bottle products, which are primarily baby bottles and baby bottle accessories.

## III. JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d). The Plaintiff Class involves more than 100 individuals. A member of the

Plaintiff Class is a citizen of a state different from the Defendants, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000.00 exclusive of interest and costs.

8.    Venue is proper in this district under 28 U.S.C. §1391. Defendant Avent is incorporated under the laws of the State of Illinois; has availed itself to the laws and protection of the State of Illinois; markets and sales plastic bottle products here; and has its principal offices in this District.

### IV. FACTUAL ALLEGATIONS

**A.    Bisphenol A, Its Uses, And Actual/Potential Health Risks.**

9.    As discussed above, this action concerns potentially toxic material used in polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by Defendants. The potentially toxic material, otherwise known as the industrial chemical Bisphenol-A (2, 2-bis (4-hydroxyphenly)-propane, hereinafter referred to as "BPA"), is currently used as a primary monomer[1] in polycarbonate plastic and epoxy resins.[2]

10.    BPA is a fundamental building block in polycarbonate plastics that are widely used in a myriad of consumer products — from mostly clear plastic baby bottles, training or spill-proof cups, and reusable drink containers (like those produced, manufactured, distributed, and/or sold by Defendants and purchased by Plaintiff) to children's toys, microwavable food containers, beverage cans with epoxy linings, and hundreds of other products that consumers come into contact with every day.

11.    Although the strong polycarbonate plastic that BPA is used for appears indestructible and safe, unfortunately the material is dangerously flawed in a manner

---

[1] A monomer is a small molecule that may become chemically bonded to other monomers to form a polymer. A polymer is a substance composed of molecules with large molecular mass consisting of repeating structural units, or monomers, connected by covalent chemical bonds. The individual molecules that comprise a polymer are referred to as polymer molecules. In popular usage, the term "polymer" is used as a synonym for plastic.

[2] Epoxy resins are polyether resins formed originally by the polymerization of Bisphenol-A and epichlorohydrin, having

undetectable to the human eye. The ester bond that links BPA monomers to one another to form polymer chains is not stable, and thus the polymer decays with time. When liquid or food comes into contact with the decayed area, BPA is released into the liquid or food and ingested by the consumer. This leaching of BPA from the plastic into the liquid or food is accelerated when these bottles are subjected to heat such as when the bottle is microwaved.

12.     The extreme cause for concern is that, for many years, scientists have commented on, and been very troubled with, the harmful effects of BPA on human health. Numerous studies and papers have repeatedly shown that BPA can be toxic even at extremely low doses and recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

13.     Most recently, in April 2008, the National Toxicology Program ("NTP") issued a draft brief prepared by the NTP Center for the Evaluation of Risks to Human Reproduction ("CERHR") titled *DRAFT NTP BRIEF ON BISPHENOL A* (hereafter "NTP Draft Brief") that discusses the chemical, human exposure, and whether BPA can affect human development or reproduction.

14.     The salient points about what BPA is and its uses are summarized below:

   a.  BPA is a high production volume chemical that is widely used in the manufacture of polycarbonate plastics and epoxy resins;

   b.  Polycarbonate plastics have many applications including use in certain food and drink packaging, e.g., water and infant bottles, compact discs, impact-resistant safety equipment, and medical devices;

   c.  Polycarbonate plastics are typically clear and hard and marked with the recycle symbol "7" or may contain the letters "PC" near the recycle symbol; and

   d.  Epoxy resins are used as lacquers to coat metal products such as food cans, bottle tops, and water supply pipes.

high strength, and low shrinkage during curing and can be used as a coating, adhesive, casting, or foam.

15.    NTP also explains how humans come into contact with BPA:

The primary source of exposure to BPA for most people is through the diet, in food and beverages;

    a.  BPA can migrate into food from food and beverage containers with internal epoxy resin coatings and from consumer products made of polycarbonate plastic such as baby bottles, tableware, food containers, and water bottles;

    b.  The highest estimated intakes of BPA in the general population occur in infants and children. Infants and children have higher intakes of many widely detected environmental chemicals because they eat, drink, and breathe more than adults on a pound for pound basis. In addition, infants and children spend more time on the floor than adults and may engage in certain behaviors, such as dirt ingestion or mouthing of plastic items that can increase the potential for exposure; and

    c.  Biomonitoring studies show that human exposure to BPA is widespread. The 2003 — 2004 National Health and Nutrition Examination Survey (NHANES III) conducted by the Centers for Disease Control and Prevention (CDC) found detectable levels of BPA in 93% of 2,517 urine samples from people 6 years and older. This study did not include children younger than 6 years of age. The CDC NHANES data are considered representative of exposures in the United States because of the large number of people included in the survey and the process used to select participants. In addition, the analytical techniques used by the CDC to measure BPA are considered very accurate by the scientific community.

16.    NTP observed that studies with laboratory rodents show that exposure to high dose levels of BPA during pregnancy and/or lactation can reduce survival, birth weight, and growth of offspring early in life, and delay the onset of puberty in males and females. "These `high' dose effects of [BPA] are not considered scientifically controversial and provide *clear evidence* of adverse effects on development in laboratory animals." *NTP Draft Brief,* at 9.

17.    NTP also observed that a variety of effects related to neural and behavior alterations, precancerous lesions in the prostate and mammary glands, altered prostate gland and urinary tract development, and early onset of puberty in females have been reported in laboratory rodents exposed during development to much lower doses of BPA that are more  similar to

human exposures.

18.    NTP concluded, in part, that current exposures to BPA are possibly high enough to cause concern:

> rodents exposed during development to much lower doses of BPA that are more similar to human exposures.

19.    NTP concluded, in part, that current exposures to BPA are possibly high enough to cause concern:

> "The 'high' dose effects of [BPA] in laboratory animals that provide *clear evidence* for adverse effects on development, i.e., reduced survival, birth weight, and growth of offspring early in life, and delayed puberty in female rats and male rats and mice, are observed at levels of exposure that far exceed those encountered by humans. However, estimated exposures in pregnant women and fetuses, infants, and children are similar to levels of [BPA] associated with several `low' dose laboratory animal findings of effects on the brain and behavior, prostate and mammary gland development, and early onset of puberty in females."
>
> *NTP Draft Brief;* at 32.

20.    Some other important recent studies concerning BPA and its potential effects on human health are summarized below:

> a.    Experiments with rats demonstrate that low level exposure to BPA during fetal growth causes breast cancer in adults. See Murray, T. J., et al., *Induction of mammary gland ductal hyperplasias and carcinoma in situ following fetal bisphenol A exposure,* Reproductive Toxicology 23: 383-390.
>
> b.    *In utero* exposure to BPA causes long-term effects on mammary tissue development in rats, increasing risks to cancer, and also increases to a chemical known to cause breast cancer. *See* Durando, M., et al. *Prenatal Bisphenol A Exposure Induces Preneoplastic Lesions in the Mammary Gland in Wistar Rats,* Environmental Health Perspectives 115, No. 1 (January 2007).
>
> c.    Perinatal exposure to extremely low levels of BPA causes precancerous prostate lesions in rats. See Ho, S-M, et al., *Developmental Exposure to Estradiol and Bisphenol A Increases Susceptibility to Prostate Carcinogenesis and Epigenetically Regulates Phosphodiesterase Type 4 Variant 4,* Cancer Research 66: 5624-5632.

d. Experiments with mice reveal that chronic adult exposure to BPA causes insulin resistance. *See* Alonso-Magdalena, P., et al., *The Estrogenic Effect of Bisphenol-A Disrupts the Pancreatic β-Cell Function in vivo and Induces Insulin Resistance,* Environmental Health Perspectives 114:106-112.

e. In a small prospective study, researchers in Japan report that BPA levels are higher in women with a history of repeated spontaneous miscarriages. *See* Sugiura-Ogasawara, M., et al., *Exposure to bisphenol A is associated with recurrent miscarriage,* Human Reproduction 20: 2325-2329.

f. BPA and the birth control pharmaceutical ethinylestradiol cause adverse effects in prostate development in mice at levels to which millions of Americans are exposed each year. *See* Timms, B. G., et al., *Estrogenic chemicals in plastic and oral contraceptives disrupt development of the fetal mouse prostate and urethra,* Proceedings of the National Academy of Sciences 102: 7014-7019.

g. A flood of new information about BPA revealing both widespread human exposure and effects at extremely low doses sparks a call for a new risk assessment of the compound. *See* vom Saal, F., et al., *An Extensive New Literature Concerning Low-Dose Effects of Bisphenol A Shows the Need for a New Risk Assessment,* Environmental Health Perspectives 113:926-933.

h. Several weakly estrogenic compounds including BPA are as powerful as estrogen at increasing calcium influx into cells and stimulating prolactin secretion. *See* Wozniak, A. L., et al., *Xenoestrogens at Picomolar to Nanomolar Concentrations Trigger Membrane Estrogen Receptor-α-Mediated* $Ca^{2+}$ *Fluxes and Prolactin Release in GH3/B6 Pituitary Tumor Cells,* Environmental Health Perspectives 113:431-439.

i. Exposures to 115th the level considered safe are sufficient to *alter* maternal behavior in mice. *See* Palanza, P., et al, *Exposure to a low dose of bisphenol A during fetal life or in adulthood alters maternal behavior in mice,* Environmental Health Perspectives 110 (suppl 3): 415-422.

j. An accident in the lab, followed by careful analysis and a series of experiments reveals that BPA causes aneuploidy in mice at low levels of exposure. Because aneuploidy in humans causes spontaneous miscarriages and some 10-20% of all birth defects, this implicates BPA in a broad range of human developmental errors. *See* Thomas, B. F., et al., *Bisphenol A exposure causes meiotic aneuploidy in the female mouse,* Current Biology 13: 546-553.

k. Experiments by researchers at the University of Missouri raise the possibility of widespread contamination of laboratory experiments by BPA. Their results demonstrate that at room temperature significant

amounts of this estrogenic substance leach into water from old polycarbonate animal cages. This inadvertent contamination could interfere with experiments designed to test the safety of estrogenic chemicals, and lead to false negatives and conflicting results. *See* Howdeshell, K. A., et al., *Bisphenol A is released from used polycarbonate animal cages into water at room temperature,* Environmental Health Perspectives 111:1180-1187.

l.  An analysis of the biochemical mechanisms of endocrine disruption suggests why industry has been unable to replicate crucial low-dose impacts of BPA on prostate development. *See* Welshons, W. V., et al., *Large effects from small exposures. I. Mechanisms for endocrine disrupting chemicals with estrogenic activity,* Environmental Health Perspects 111:994-1006.

m.  Using new analytical methods, a team of German scientists measured BPA in the blood of pregnant women, in umbilical blood at birth and in placental tissue. All samples examined contained BPA, at levels within the range shown to alter development. Thus widespread exposure to BPA at levels of concern is no longer a hypothetical issue. *See* Schonfelder, G., et al., *Parent Bisphenol A Accumulation in the Human Maternal-Fetal-Placental Unit,* Environmental Health Perspectives 110:A703-A707.

n.  At extremely low levels, BPA promotes fat cell (adipocyte) differentiation and accumulation of lipids in a cell culture line used as a model for adipocyte formation. These two steps, differentiation and accumulation, are crucial in the development of human obesity. Hence this result opens up a whole new chapter in efforts to understand the origins of the world-wide obesity epidemic. *See* Masuno, H., et al., *Bisphenol A in combination with insulin can accelerate the conversion of 3T3-L1 fibroblasts to adipocytes,* Journal of Lipid Research 43:676-684.

o.  In cell culture experiments, BPA at very low (nanomolar levels) stimulates androgen-independent proliferation of prostate cancer cells. This finding is especially important because when prostate tumors become androgen-independent they no longer respond to one of the key therapies for prostate cancer. *See* Wetherill, Y. B., et al., *The Xenoestrogen Bisphenol A Induces Inappropriate Androgen Receptor Activation and Mitogenesis in Prostatic Adenocarcinoma Cells,* Molecular Cancer Therapeutics 1: 515-524.

p.  BPA causes changes in rat ventral prostate cells that appear similar to events that make nascent prostate tumors in humans more potent. *See* Ramos, J.G., et al., *Prenatal Exposure to Low Doses of Bisphenol A Alters the Periductal Stroma and Glandular Cell Function in the Rat Ventral Prostate,* Biology of Reproduction 65: 1271- 1277.

q.  BPA induces changes in mouse mammary tissue that resemble early stages mouse and human of breast cancer. *See* Markey, C. M., et al., *In Utero*

8

*Exposure to Bisphenol A Alters the Development and Tissue Organization of the Mouse Mammary Gland,* Biology of Reproduction 65: 1215-1223.

r.  BPA lowers sperm count in adult rates even at extremely low levels. *See* Sakaue, M., et al., *Bisphenol-A Affects Spermatogenesis in the Adult Rat Even at a Low Dose,* Journal of Occupational Health 43: 185-190.

s.  BPA is rapidly transferred to the fetus after maternal intake. *See* Takahashi, O., et al., *Disposition of Orally Administered 2,2-Bis (4-hydroxyphenyl) propane (Bisphenol A) in Pregnant Rats and the Placental Transfer to Fetuses,* Environmental Health Perspectives 108: 931-935.

t.  An independently funded academic laboratory can verify controversial BPA results**,** even though industry cannot. *See* Gupta, Chhanda, *Reproductive malformation of the male offspring following maternal exposure to estrogenic chemicals,* Experimental Biology and Medicine 224: 61-68.

u.  Metabolic differences between rats and humans probably mean that humans are more sensitive to BPA than are rats. *See* Elsby, R., et al., *Comparison of the modulatory effects of human and rat liver microsomal metabolism on the estrogenicity of bisphenol A: implications for extrapolation to humans,* Journal of Pharmacology and Experimental Therapeutics 297:103-113.

v.  A confirmation of BPA low dose effects, and demonstration that the effects include impacts on estrous cyclicity and plasma LH levels. *See* Rubin, B. S., et *al., Perinatal Exposure to Low Doses of Bisphenol A Affects Body Weight, Patterns of Estrous Cyclicity, and Plasma LH Levels,* Environmental Health Perspectives 109: 675-680.

21.    Recently, and worthy of further highlight, on or about November 28-30, 2006, a National Institute of Health Funded Group (the "Group") consisting of 38 of the world's leading scientists with regard to Bisphenol-A, met at Chapel Hill, North Carolina to examine the relationship between BPA and the negative trends in human health that have occurred in recent decades such as increases in abnormal penile/uretha development in males, early sexual maturation caused in females, increased neuron-behavioral problems such as ADHD and autism, increased childhood and adult obesity and Type II diabetes, regional decreases in sperm court, and an increase in honnonally mediated cancers, such as prostate and breast cancers. Heightened concern was paid to the relationship between treatment with "low doses" of BPA and the many

negative health outcomes confirmed by experimental studies in laboratory animals as well as in vitro studies that identified plausible molecular mechanisms responsible for mediating such effects.

22.    This eminent collection of scientists concluded that the wide range of adverse effects of low doses of BPA in laboratory animals exposed both during development and in adulthood "is a great cause for concern with regard to the potential for similar adverse effects in humans." The Group also concluded that recent trends in human diseases relate to adverse observed in experimental animals exposed to low doses of BPA, the specific examples of which include the conditions described in Paragraph 21.

23.    Furthermore, the Group concluded that there is extensive evidence documenting that negative health outcomes may not become apparent until long after BPA exposure during development has occurred — that the issue of a very long latency for effects in utero is well known and these developmental effects are irreversible and can occur due to low dose exposure during brief sensitive periods in development, even though BPA may not be detected when the damage or disease is expressed. Furthermore, the group's findings indicate that acute studies in animals, particularly traditional toxicological studies that only involve the use of high doses of BPA (like those relied upon by the chemical and plastic industries), do not reflect the situation in humans.

24.    Consistent with these well-accepted and well-founded conclusions as reached by the Group, the NTP found that the "possibility that bisphenol-a may alter human development cannot be dismissed." *NTP Draft Brief,* at 9.

25.    Given statements such as these, of immediate and urgent concern is BPA's toxicity and its link to serious and significant health problems, which pose a serious threat to Plaintiff's and the proposed Plaintiff Class' health; and, as in Plaintiff's case, the health of his

infants and children.

    **B.    Defendants' Wrongful Conduct.**

    26.    During all times relevant hereto, and despite the well-documented scientific evidence discussed above, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using a dangerous chemical that has been known for years to be toxic in several respects and which poses serious hazards to an individuals' health. Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual health with no mention as to the potentially toxic substance the products contain.  For example, Defendant Avent's business strategy seems to target consumers which are new and/or expecting parents by touting its products as superior, in terms of both healthiness and safety, when compared to other similar baby products. On its website, Defendant Avent boasts that it has "set the standard for feeding bottles worldwide."

http://www.consumer.philips.com/consumer/en/us/consumer/cc/_categoryid_PHILIPS_AVENT _STORY_AR_US_CONSUMER/ (July 22, 2008).

    27.    Defendant Avent's labeling and packaging of its polycarbonate plastic bottle products have made (and continue to make) similar claims. Yet, while Defendant Avent's labeling and packaging of its polycarbonate plastic bottle products have touted (and continues to tout) the products' supposed health benefits, safeness, and overall superiority, the labeling and packaging has not (and does not) sufficiently and/or adequately disclosed material information as to the fact that its polycarbonate plastic bottle products are formulated with and/or contain BPA, nor material information as to the potential health risks associated with polycarbonate plastic bottle products and BPA as discussed above.

    28.    Defendant Avent has failed (and continues to fail) to properly and adequately

11

disclose the risk of harm to Plaintiff and the proposed Plaintiff Class despite the fact that it knew, or should have known, of the potential harm posed by its polycarbonate plastic bottle products, which contain BPA. The failure to disclose as described herein is a misrepresentation and constitutes a deceptive and/or unfair trade practice consistent with applicable statutory and common law.

29.    The polycarbonate plastic bottle products purchased by Plaintiff from Defendant Avent are polycarbonate plastic bottle products that contain the dangerous chemical Bisphenol-A. Specifically, Plaintiff purchased 4 oz. and 8 oz. reusable baby bottles produced, manufactured, distributed, and/or sold by Avent.

30.    Plaintiff purchased Defendant Avent's polycarbonate plastic bottle products unaware that they were formulated with and/or contained BPA, a potentially toxic material, because Defendant Avent did not adequately disclose such information. Had he known, he would not have purchased Defendant Avent's polycarbonate plastic bottle products.

31.    Indeed, although consumers can try to avoid polycarbonate plastic bottle products, most (like Plaintiff) were/are simply unaware that a toxic chemical which acts like a female hormone can leach from these products and contaminate the liquid or food ingested by them, and/or more importantly, their children.

32.    This lack of consumer awareness is a direct result of the Defendant Avent's, and the other Defendants', efforts to perpetuate a very lucrative revenue stream that would be interrupted and reduced if the general public and persons similarly situated to Plaintiff were to learn the truth and seek safer alternatives.

## V. CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of Rule 23 are met with respect to the classes defined below.

**A.     The Plaintiff Class.**

34.     Plaintiff brings his claim on his own behalf, and on behalf of the following class:

> All persons in the United States who, over the past five years, purchased polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendants and who were accordingly damaged thereby.

35.     Plaintiff reserves the right to amend or modify his Complaint and/or the Plaintiff Class definition in connection with meaningful discovery and/or a Motion for Class Certification.

36.     Members of the Plaintiff Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. The Plaintiff Class, upon information and belief, includes thousands if not hundreds of thousands of individuals geographically dispersed throughout the United States. The precise number and identities of Class members are unknown to Plaintiff but can be easily obtained through notice and discovery. Indeed, notice can be provided through a variety of means including publication, the cost of which is properly imposed upon the Defendant.

37.     Plaintiff will fairly and adequately protect the interests of all Plaintiff Class members and has retained counsel competent and experienced in class and consumer litigation.

38.     Plaintiff's claims are typical of the claims of the Plaintiff Class and all Plaintiff Class members sustained uniform damages arising out of the conduct challenged in this action. The Plaintiff Class is ascertainable and there is a well-defined community of interests in the questions of law and/or fact alleged since the rights of each Plaintiff Class member were infringed or violated in a similar fashion based upon the Defendants' wrongdoing. The injuries sustained by the Plaintiff and the Plaintiff Class members flow, in each instance, from a common nucleus of operative facts — the Defendant's wrongdoing. In every related case, Plaintiff and the

Plaintiff Class members suffered uniform damages caused by their purchase of polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by the Defendants.

39.    There are questions of law and fact common to the Plaintiff Class that predominate over any questions solely affecting individual Plaintiff Class members. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Plaintiff Class members. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

40.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Plaintiff Class members is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Plaintiff Class members to individually redress the wrongs done to them.

41.    Defendants have acted or have refused to act on grounds generally applicable to the Plaintiff Class thereby making it appropriate to grant final declaratory and injunctive relief with respect to the Plaintiff Class as a whole.

**B.    The Defendant Class.**

42.    Defendant Avent is sued herein individually and as the representative of the Defendant Class described above consisting of all producers, manufacturers, and/or otherwise distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A.

43.    The Defendant Class is composed of numerous companies substantially similar to Defendant Avent; so much so that joinder of all of the Defendants as named defendants would impracticable.

44.    The claims and defenses of Defendant Avent are typical of the claims and defenses of the other Defendants, and Defendant Avent will fairly and adequately protect the

interests of all other members of the Defendant Class.

45.    There are questions of law and fact common to the members of the Defendant Class that predominate over any individual questions affecting individual Defendants.

46.    Prosecution of separate actions by individual members of the Defendant Class would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed class, which would establish incompatible standards of conduct for the Defendants.

47.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual members of the Defendant Class do not have a great interest in individually controlling the defense of separate actions. Further, many of the members of the proposed Defendant Class do not have individual defenses to this action, and any core ruling or precedent affecting the named Defendants would be equally applicable to all members of the Defendant Class.

48.    Concentrating this litigation is one forum is desirable, because it would greatly conserve judicial resources and provide for the expedient and efficient resolution of the claims asserted herein.

49.    This proposed class action does not present any extraordinary or unusual difficulties affecting its management as a class action. Plaintiff knows of no difficulties that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Indeed, it would be the most appropriate structure of litigation.

<b><u>VI. CAUSES OF ACTION</u></b>

**A.    CONSUMER PROTECTION LAWS ON BEHALF OF NATIONWIDE CLASS**

**1.    COUNT I:  FOR VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.* BASED UPON OMISSION OR CONCEALMENT**

50.    Count I is brought by Plaintiff, individually and on behalf of the Class.  Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

51.    Defendants engaged in unfair and/or deceptive acts and practices by, among other things, concealing, suppressing, omitting or failing to inform Plaintiff and members of the Class, that their polycarbonate bottles contain BPA.

52.    Upon information and belief, Defendants knew or should have known of the harmfulness of BPA contained in their products, but did not disclose the information to Plaintiff and members of the Class.

53.    Defendants intended that Plaintiff and the members of the Class rely on their omissions and concealment of material facts regarding the polycarbonate bottles and the risk it posed by containing BPA, and Plaintiff and the members of the Class were actually deceived by Defendants' omissions and concealment as it portrayed that the bottles were safe for use.

54.    If not for Defendants' deceptive and unfair act of failing to inform Plaintiff and the members of the Class as to the risk posed by the BPA in the polycarbonate bottles, Plaintiff and members of the Class would not have purchased or used the bottles.

55.    Defendants were able to sell millions of products that they could not have sold absent their deceptive marketing campaign, causing the Plaintiff and members of the Class substantial injuries.

56.     The acts, practices, misrepresentations and omissions by Defendants described above, with intent that Plaintiff and other members of the Class rely upon the concealment, suppression and omission of such material facts, constituted unfair and/or deceptive acts and practices occurring in the course of conduct involving trade or commerce within the meaning of 815 ILCS section 505/1, *et seq*.

57.     Defendants' misconduct in the course of trade and/or commerce offends public policy and is immoral, unethical, oppressive, and/or unscrupulous and caused substantial injury to consumers.

58.     Plaintiff and members of the Class suffered damages as a result of Defendants' deceptive and/or unfair acts.   Accordingly, Plaintiff, on behalf of himself and the other Class members, seek monetary damages, punitive damages and such other and further relief as set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act.

**2.     COUNT II: FOR VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*, BASED UPON MISREPRESENTATIONS**

59.     Count II is brought by all Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

60.     Defendants engaged in unfair and/or deceptive acts and practices by, among other things, the dissemination of deceptive and misleading advertising and marketing materials stating that their polycarbonate bottles were safe for use.

61.     Upon information and belief, Defendants knew or should have known of the harmfulness of BPA contained in their products, but did not disclose the information to Plaintiff and members of the Class.

62.     Defendants intended that Plaintiff and the members of the Class rely on their deceptive acts and misrepresentations, and Plaintiff and the members of the Class were actually

deceived by Defendants' representations that their polycarbonate bottles were safe for use when in fact the products were not safe by virtue of the fact that they contained harmful BPA.

63.    If not for Defendants' deceptive and misleading representations, Plaintiff and members of the Class would not have purchased the polycarbonate bottles.

64.    Defendants were able to sell millions of products that they could not have sold absent their deceptive marketing campaign, causing the Plaintiff and members of the Class substantial injuries.

65.    The acts, practices, and misrepresentations by Defendants described above, with intent that Plaintiff and other members of the Class rely upon the deceptive acts and misrepresentations, constituted unfair and/or deceptive acts and practices occurring in the course of conduct involving trade or commerce within the meaning of 815 ILCS section 505/1, *et seq*.

66.    Defendants' misconduct in the course of trade and/or commerce offends public policy and is immoral, unethical, oppressive, and/or unscrupulous and caused substantial injury to consumers.

67.    Plaintiff and members of the Class suffered damages as a result of Defendants' deceptive and/or unfair acts.  Accordingly, Plaintiff, on behalf of himself and the other Class members, seek monetary damages, punitive damages and such other and further relief as set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act.

B.    **IMPLIED WARRANTY CLAIMS**

    1.    **COUNT III: FOR VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY ON BEHALF OF RESIDENTS OF CERTAIN STATES.**

68.    Count III is brought by Plaintiff, individually, and on behalf of all similarly situated residents of Alaska, Arkansas, Colorado, Delaware, Hawaii, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New

Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia and Wyoming (hereinafter "Implied Warranty Subclass"). Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

69.    At all times, there were in effect the following statutes governing the implied warranty of merchantability:  Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2 314; CRS § 4-2-314; 6 Del. C. § 2-314; HRS § 490:2-314; § 554.2314; 11 M.R.S.A. § 2 314; Md. Code Ann. Art. 95B § 2-314; Mass. Gen. Laws. Ch. 106 § 2-314; Miss. Code. Ann. § 75-2-314; MCA 30-2-314; Neb. UCC 2-314; NRS 104.2314; N.J.S.A. 12A:2-314; NDCC 2-314; O.S. 1991 § 2-314; G.L. 1956 §6A-2-314; S.C. Code Ann. § 36-2-314; SDCL 57A-2-314; Tex. Bus. & Com. Code Ann. § 2-314; VA. Code § 8.2-314; W. VA. Code § 46-2-314; and Wyo. Stat. 34.1-2-314.

70.    As a designer, manufacturer, producer, marketer, licenser and seller of polycarbonate bottles, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

71.    Avent polycarbonate bottles are "goods," as defined in various states' commercial codes governing the implied warranty of merchantability.

72.    Implied in the sale of Avent polycarbonate bottles is a warranty of merchantability that requires, among other things, is that Avent polycarbonate bottles pass without objection in the trade and are of merchantable quality and safe and fit for such use.

73.    Because the polycarbonate bottles contained BPA and inherently caused damage to Plaintiff and Class members as a result of the BPA, the Avent polycarbonate bottles were unsafe and were therefore not merchantable at the times they were sold, as impliedly warranted by Defendants.

19

74.    Due to Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class could not have known about the risks associated with the BPA in the polycarbonate bottles until after Plaintiff suffered damage caused by the bottles.

75.    Defendants were put on notice of the BPA in the polycarbonate bottles by the numerous medical reports and studies concerning the defect.

76.    As a direct and proximate result of the Defendants' breach of implied warranty, Plaintiff and members of the Class suffered damages as alleged herein.

**2.    COUNT IV: FOR BREACH OF EXPRESS WARRANTY**

77.    Count IV is brought by Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

78.    Defendant expressly warranted that the polycarbonate bottles were manufactured and were safe to use. Even today, Defendant states on its website: "We have been manufacturing baby bottles for nearly 25 years and we completely stand by our products and see no reason to phase out polycarbonate at this stage although we will continue to look at all of the options." http://www.consumer.philips.com/consumer/en/us/consumer/cc/_categoryid_PHILIPS_AVENT_ON_BPA_AR_US_CONSUMER/#id11 (July, 22, 2008)

79.    The polycarbonate bottles did not conform to these express representations, because the products were not safe for use due to the BPA found in them.

80.    Due to Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class could not have known about the risk posed by the polycarbonate until after Plaintiff suffered damage caused by the BPA.

81.    Defendants were put on notice of the danger caused by the polycarbonate bottles by the numerous medical reports and studies concerning BPA.

82.     As a direct and proximate result of the breach of said warranties, and as the direct and legal result of the BPA in the polycarbonate bottles as designed, manufactured, packaged, labeled, and supplied by Defendants, and other wrongdoing of Defendants described herein, Plaintiff and members of the Class were caused to suffer damages.

## C.     COUNT V: STRICT LIABILITY

83.     Count V is brought by Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

84.     At all relevant times, Defendants were producers, manufacturers, and/or distributors of polycarbonate bottles.

85.     Polycarbonate bottles produced, manufactured, and/or distributed by Defendants were unreasonably dangerous in that, when the bottles left the hands of the Defendants they contained BPA which was harmful to the Plaintiff and members of the Class.

86.     Defendants' products were expected to and did reach Plaintiff and members of the Class without substantial change in condition.

87.     As a direct and proximate result of the unreasonably dangerous condition of the polycarbonate bottles, as produced, manufactured, and/or supplied by Defendants, Plaintiff and members of the Class have suffered direct economic loss.

## D.     COUNT VI: NEGLIGENCE

88.     Count VI is brought by Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

89.     Defendants had a duty to exercise reasonable care in the design, manufacture, sale, and/or distribution of polycarbonate bottles into the stream of commerce, including a duty to assure that the products did not cause harm or damage to consumers.

90.     Defendants failed to exercise ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, and/or distribution of polycarbonate bottles into interstate commerce in that Defendants knew or should have known that the bottles contained

BPA that posed a risk of injuring the consumers.  Defendants' failure to exercise reasonable care in the design, manufacture, sale, and/or distribution of the polycarbonate bottles was grossly negligent.

91.    Specifically, Defendants were grossly negligent in the design, manufacture, testing, advertising, warning, marketing, and/or sale of polycarbonate bottles in that they:

a.  Failed to use due care in designing, and/or manufacturing the relevant products so as to avoid the aforementioned risks to Plaintiff and Class members;

b.  Failed to accompany their products with proper warnings regarding all possible adverse effects associated with the relevant products;

c.  Failed to conduct adequate testing and post-marketing surveillance to determine the safety of the relevant products;

d.  Failed to warn Plaintiff and members of the Class prior to actively encouraging the sale of polycarbonate bottles either directly or indirectly, orally or in writing, about the following:  that the polycarbonate bottles contained BPA and could be harmful as described herein, and

e.  Were otherwise careless or grossly negligent.

92.    Despite the fact that Defendants knew or should have known that the polycarbonate bottles could cause unreasonable damage to Plaintiff and Class members, Defendants continued to market the relevant products to consumers including Plaintiff.

93.    Defendants knew or should have known that consumers such as Plaintiff and the Class would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

94.    Defendants' negligence was a proximate cause of Plaintiff's and the Class' economic damages, as previously set forth herein.

**D.    UNJUST ENRICHMENT**

**COUNT VII: UNJUST ENRICHMENT FOR RESIDENTS OF CERTAIN STATES**

95.    Count VII is brought by Plaintiff individually, and on behalf of all similarly situated residents of Alaska; Arkansas; California; Colorado; Connecticut; District of Columbia; Florida; Georgia; Hawaii; Illinois; Indiana; Iowa; Kansas; Kentucky; Maine; Michigan; Minnesota; Mississippi; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New

Mexico; New York; North Carolina; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Carolina; South Dakota; Utah; Vermont; Virginia; Washington; West Virginia; and Wisconsin for unjust enrichment (the "18-State Unjust Enrichment Subclass"). Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

96.    At all times relevant hereto, Defendants designed, manufactured, produced, marketed, and/or sold polycarbonate bottles that contained BPA.

97.    Plaintiff and members of the Class conferred upon Defendants, without knowledge that the polycarbonate bottles posed a risk of damaging consumers, payment for the polycarbonate bottles, which are benefits that were non-gratuitous.

98.    Defendants appreciated, or had knowledge of the non-gratuitous benefits conferred upon them by Plaintiff and members of the Class.

99.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiff and members of the Class were not receiving products of high quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

100.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the Class is unjust and inequitable, Plaintiff and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

**E.    COUNT VIII:  ALTERNATIVE CLAIM FOR RELIEF UNDER THE STATE CONSUMER PROTECTION ACTS[3]**

101.    Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here and further allege as follows:

102.    Count VIII is brought by Plaintiff, individually, and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:

---

[3] This Count is plead in the alternative to Counts I and II.

a.  the Alaska Unfair Trade Practices And Consumer Protection Act, AS §
    45.50.471 *et seq.*;

b.  the Arizona Consumer Fraud Act, A.R.S §§ 44-1521 *et seq.*;

c.  the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101 *et seq.*;

d.  the California Unfair Competition Law, Bus. & Prof. Code §§17200, *et seq.*
    and 17500 *et seq.*;

e.  the California Consumers Legal Remedies Act, Civil Code §1750, *et seq.*;

f.  the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

g.  the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;

h.  the Delaware Consumer Fraud Act, 6 Del. C. § 2513., *et seq.*;

i.  the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

j.  the Florida Deceptive And Unfair Trade Practices Act, FSA § 501.201, *et
    seq.*;

k.  the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

l.  the Hawaii Unfair Competition Law, H.R.S. § 480-2, *et seq.*;

m.  the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

n.  the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS
    501/1 *et seq.*;

o.  the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*;

p.  the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;

q.  the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

r.  the Louisiana Unfair Trade Practices And Consumer Protection Law, LSA-
    R.S. 51:1401, *et seq.*;

s.  the Maine Unfair Trade Practices Act 5 M.R.S.A. § 207, *et seq.*;

24

t.  the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq.*;

u.  the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

v.  the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

w.  the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, *et seq.*;

x.  the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

y.  the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq.*;

z.  the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*

aa. the New Hampshire Regulation of Business Practices For Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq.*;

bb. the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

cc. the New Mexico Unfair Practices Act, N.M.S.A. 1978 §§ 57-12-1, *et seq.*;

dd. the New York Consumer Protection from Deceptive Acts and Practices, GBL § 349, *et seq.*;

ee. the North Carolina Unfair And Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

ff. the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq.*;

gg. the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.*;

hh. the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

ii. the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

jj. the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

25

kk. the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq*.;

ll. the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq*.;

mm.  the South Dakota Deceptive Trade Practices and Consumer Protection, SDCL § 37-24-1, *et seq*.;

nn. the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq*.;

oo. the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq*.;

pp. the Utah Consumer Sales Practices Act, UT ST § 13-11-175, *et seq*.;

qq. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq*.;

rr. the Virginia Consumer Protection Act of 1977, VA ST § 59.1-199, *et seq*.;

ss. the Washington Consumer Protection Act, RCWA 19.86.010, *et seq*.;

tt. the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A, *et seq*.;

uu. the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq*.; and

vv. the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq*.

103.   The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

104. Defendants' acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged Plaintiff and members of the Class in connection with the sale or advertisement of polycarbonate bottles. Defendants' conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

105. Plaintiff, on behalf of himself and the other Class members, seeks monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

## VII. JURY TRIAL DEMANDED

106. Plaintiff and the proposed Plaintiff Class demand a jury of twelve.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, request that he and the other applicable Plaintiff Class members have judgment entered in their favor and against Defendants, as follows:

A. An order certifying that this action, involving Plaintiff's and the Plaintiff Class members' claims against Defendant Avent and the Defendant Class be maintained as a nationwide class action under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and their undersigned counsel to represent the Plaintiff Class;

B. An award of actual damages in the form of restitution;

C. Appropriate injunctive relief;

D. Reasonable attorneys' fees and costs; and

27

E.      Such further appropriate relief this Court deems necessary.

Plaintiff TOM BRADY, individually, and on behalf of all others similarly situated,

By:    s/ Thomas A. Zimmerman, Jr.
        Thomas A. Zimmerman, Jr. (Bar # 6231944)
        Hugh J. Green (Bar # 6289616)
        ZIMMERMAN LAW OFFICES, P.C.
        100 West Monroe Street, Suite 1300
        Chicago, Illinois 60603
        (312) 440-0020

Counsel for the Plaintiff and Class